837 So.2d 860 (2002)
C.P.
v.
W.M. and J.M.
2010068.
Court of Civil Appeals of Alabama.
June 14, 2002.
*861 John A. Tinney, Roanoke, for appellant.
Dianne James Davis, Alexander City, for appellees.
MURDOCK, Judge.
This is the second appeal in this case. On June 22, 2001, this court reversed the previous judgment of the trial court awarding custody of D.M.D. to his paternal grandparents, W.M. and J.M., over the objection of C.P., the child's mother; we reversed because the trial court did not make an express finding in its judgment *862 that the mother was unfit. C.P. v. W.M., 806 So.2d 395 (Ala.Civ.App.2001). That opinion quoted the trial court's previous judgment at some length:
"`From the evidence and testimony it has been shown that these grandparents have played a significant role in the life of this child. The child has spent a large portion of his life with the grandparents. In summation, the mother's life has been very unstable and she has lived in several different places with different men. One relationship in particular was destructive both for the mother and the child. In that relationship both were exposed to dangerous situations, and the mother showed a reluctance to leave that relationship behind.
"`The mother had left the child with the grandparents during the 1999 ... school year and had a visitation period with the child in April, 2000. During said visitation an incident occurred between the child and the mother's current husband. The testimony presented shows that the child became involved in a dispute with his step-brother in a swimming pool which escalated into the step-father holding the child by his feet above the concrete side of the pool. Matters continued to degenerate after all parties had returned to the apartment and the mother's hand was broken during the process of whipping the child with a belt. The mother and her husband contend that the child threatened suicide, but this is simply not borne out. In any event, the mother and her husband had the child admitted into a psychiatric hospital two days later. There is no evidence that they sought immediate medical help for the child. In the opinion of the Court, the action of the mother was a gross and inappropriate reaction to the situation.
"`One of the most telling points of the evidence was when the child testified and in response to a question of why he wanted to live with his grandparents, he stated "I feel safe there." This is a concise summation of this child's turbulent life. He is safe with his grandparents. While he loves his mother and wants to visit her, her instability has in the past placed him at risk.
"`This Court is hesitant to place a child in the custody of grandparents when there is a viable parental alternative. There is no such alternative here. The child is where he should be, and custody is vested with the grandparents.'"
806 So.2d at 397.
On remand, the trial court entered a judgment providing, in pertinent part, as follows:
"This Court has followed the instructions of the Court of Civil Appeals after remand on this cause. The case was remanded for determination as to whether the standards of Ex parte Terry, 494 So.2d 628 (Ala.1986), have been satisfied in regard to the parental presumption of custody as against a non-party. Specifically, the Court of Civil Appeals held there was not an express finding as to the fitness of the natural mother as a parent.
"From a review and reconsideration of all submissions at trial, the Court finds there is competent evidence showing this parent to be unfit and improper to fulfill her parental duties and obligations to this child, and that this evidence is clear and convincing in nature.
"It is obvious that this is a harsh finding from the perspective of the mother, but after a two day ore tenus trial, and subsequent consideration and reconsideration of the evidence, it is the opinion of this Court that the finding is warranted and necessary. The mother's *863 inherent instability has led her through numerous relationships and situations which were dangerous and destructive to both herself and the child. There is no evidence to support a finding that this behavior will change in the future. She sees her child as something she needs, and cannot perceive the needs of the child. She cannot perceive the harm she does to the child in the situations she creates through personal decisions, and her solutions are physically, mentally, and emotionally dangerous to the child. `Unfit' is a broad term which may include a vast number of conditions, behaviors, and conduct.
"Accordingly, after careful review of the opinion of the Court of Civil Appeals in this case and the opinion of the Alabama Supreme Court in Ex parte Terry, this Court expressly finds that the standard[s] of Ex parte Terry have been satisfied and that this mother is unfit as a parent for this child according to those standards."
The mother filed a postjudgment motion, but no action was taken on the motion, thus causing it to be denied by operation of law (see Rule 59.1, Ala. R. Civ. P.).
The mother has again appealed, raising the same three issues she raised on her first appeal. We reached the merits of the first of these issues, which involves an evidentiary matter, in deciding the first appeal:
"The mother first contends that the trial court erred in admitting testimony of incidents that had occurred before the trial court entered its March 19, 1998, order [awarding the grandparents visitation with the child]; she argues that that order was a judgment denying an earlier petition for custody filed by the grandparents. The record does not contain a copy of that order, nor does it contain copies of any of the pleadings filed in that proceeding. However, the transcript of the testimony adduced during the ore tenus proceeding on the grandparents' April 2000 custody petition reveals that the terms of the March 1998 order were agreed upon by the parties, rather than having been dictated by the trial court in the first instance.
"`Generally, in a custody modification proceeding, one is limited to presenting evidence that relates back only to the last custody judgment.' Taylor v. Hogan, 673 So.2d 453, 455 (Ala.Civ.App. 1996). However, we have recognized an exception to that general rule in custody-modification proceedings wherein the earlier judgment awarding custody was based upon an agreement of the parties and the facts sought to be adduced were not disclosed in the proceeding giving rise to the earlier consent judgment. E.g., Handley v. Taylor, 638 So.2d 8, 9 (Ala.Civ.App.1994) (holding that where an earlier custody judgment did not follow a trial, the trial court erred in failing to consider, in a later modification proceeding, the conduct of the parties before that earlier judgment was entered).
"This case is similar to Handley, in that the trial court's March 1998 order was entered pursuant to the parties' agreement. Therefore, the issue of the parties' conduct committed before the court entered the March 1998 order was not, in the language of Handley, `rehashed' in the ore tenus proceeding on the grandparents' April 2000 custody petition. Moreover, Seibert v. Seibert, 611 So.2d 375 (Ala.Civ.App.1992), the sole case cited in the appellant's brief on this issue, is not to the contrarythe evidence relied upon by the appellant in Seibert, unlike the evidence the mother complains of in this case, had been adduced in various contested hearings leading up to an initial (unreviewed) custody *864 judgment. Therefore, the trial court did not err in admitting evidence concerning the parties' conduct committed before it entered its March 1998 order."
C.P., 806 So.2d at 396-97. We note that neither the mother nor the grandparents sought certiorari review of our previous judgment; thus, our conclusion that the trial court did not err in considering the evidence challenged by the mother was a substantive determination that constitutes the law of the case, and is not subject to reexamination on this appeal. See Walker v. Norfolk S. Ry. Co., 765 So.2d 665, 667 (Ala.Civ.App.2000).
The mother's remaining two issues concern whether the trial court properly awarded custody of the child to the grandparents. When a trial court "makes findings of fact based on evidence presented ore tenus, an appellate court will presume that the trial court's judgment based on those findings is correct, and it will reverse that judgment only if it is found to be plainly and palpably wrong." Ex parte Byars, 794 So.2d 345, 347 (Ala.2001). "The presumption of correctness accorded the trial court's judgment entered after the court has heard evidence presented ore tenus is especially strong in a child-custody case." Id. (emphasis added).
As to the substantive burden that the grandparents bore, we again quote from our earlier opinion:
"In Ex parte Terry, 494 So.2d 628, 632 (Ala.1986), our Supreme Court noted that in order for a nonparent to overcome a natural parent's right to the custody of his or her child, there must be either `a showing of voluntary forfeiture of that right' by the natural parent or a finding of `misconduct or neglect to a degree which renders that parent an unfit and improper person to be entrusted with the care and upbringing of the child in question.' Such a finding must be made based upon `clear and convincing' evidence. Id. at 630."
806 So.2d at 397-98. The trial court's judgment on remand indicates that that court considered the principles of Terry in awarding custody of the child to the grandparents.
The record from the previous appeal (of which this court may take judicial notice, see Butler v. Olshan, 280 Ala. 181, 191 So.2d 7 (1966)), indicates that the mother has lived with various men out of wedlock since the child's third birthday. While living with one paramour, the mother began dating a second man and married him in 1993. However, the mother's relationship with this man, i.e., her second husband after the child's father, was quite stormy; the mother testified to having had physical altercations with her second husband that the child had witnessed and to having had to "call the police out on [the husband] ... [n]umerous times" during their six-year relationship. The mother also testified that her second husband had threatened both her life and the child's life on several occasions, ultimately causing her to seek a divorce and a restraining order; the child described having been threatened with a gun by the mother's second husband.
In addition, the mother admitted having lived in approximately 17 different homes during the child's 11 years,[1] and there was evidence indicating that the child had already been in three different school systems by September 1999, when the mother asked the grandparents to let the child live with them during the 1999 school year. At *865 that time, the mother was not working, but was enrolled in school on a full-time basis and admitted that she had had "plenty of time" to take care of any problems the child may have had.
In September 1999, the child enrolled in an elementary school located near the grandparents' home. The child testified that he liked being in school there, calling it "kind of safe" and indicating that he had more friends there than at previous schools. While the child's grades at the school were initially quite low,[2] there was evidence indicating that the child's academic performance had improved to some extent during the second half of the school year and that the child had ultimately passed all subjects except mathematics. One of the child's teachers testified that while the child had been disruptive in class and had exhibited signs of mild attention-deficit disorder, the grandparents and the child's father had worked with the child's teacher to improve the child's behavior.
The principal incident prompting the grandparents to seek custody of the child, what the grandmother termed the "last straw," arose during the child's visit to the mother's apartment during April 2000. Just before that visit, the mother had married a third time, and her new husband and two of his children from a previous marriage had moved in with the mother. On the Thursday before Easter Sunday, the child was involved in a water fight in an apartment swimming pool with his new stepbrother and stepsister that escalated to blows. The mother's new husband picked the child up and held the child by the feet over the swimming pool and caused the child's head to hit the walkway near the pool and subsequently placed his hands around the child's neck, hurting the child.[3] Later that day, the child's stepbrother taunted him, prompting him to shove the stepbrother; the mother responded by taking the child into a bedroom and whipping him with a large belt. During this administration of punishment, the mother broke her hand, after which she retreated to her bedroom and slammed the door in the child's face. The stepfather then again placed his hands around the child's neck while asking "What did you do?"
There is considerable dispute concerning the following events. According to the mother's testimony, the child began banging his head in his room and later said that he wished he were dead and that he wanted to kill himself.[4] The child testified that he simply lay his head against a wall because he was "thinking what they would do to me," and that he said that he "didn't want to be here," i.e., "at that house." However, it is undisputed that the mother and the stepfather did not seek any medical or psychological treatment for the child on that day. Rather, after the child telephoned the grandparents (with the mother's permission) and asked them to meet him at a local store the next morning (Good Friday), the mother telephoned the grandparents and said that they would not be coming that morning.
Two days later, on Saturday, citing the child's alleged suicide threats, the mother and the stepfather placed the child in a *866 secure mental institution in Birmingham. Although the mother told the grandparents that the child had been placed in a mental facility, neither the mother nor the stepfather told the grandparents the name of the facility into which the child had been placed, and both refused to respond to telephone calls from the grandparents concerning the child's placement. Although the child had been in the grandparents' care for practically all of the preceding 10 months, the grandparents were unable to locate either the mother's or the child's exact whereabouts during the succeeding week, and it was only by obtaining an emergency pendente lite custody order that they were able to locate the child and return him to school near their home. While there is some indication that the child, although basically a normal child for his age, has some psychological problems, there is no evidence that the child has made any suicidal acts or threats since his return to the grandparents' home, and the child testified that he felt "safe" living with his grandparents.
In considering the totality of the evidence, the trial court could properly have concluded that the child's welfare had suffered because of the mother's choices to uproot frequently and to remain in an abusive and dangerous relationship with her second husband, that the mother's current husband had used disciplinary tactics that had endangered the child, and that the mother had grossly and inappropriately reacted to the child's behavior. Notably, the trial court determined that the existence of the child's alleged suicide threat was "simply not borne out," despite the mother's evidence concerning the child's alleged statements regarding suicide to be credible, and its judgment noted the two-day lapse between the alleged statements and head banging and the child's placement in a mental institution without notice to the grandparents, his then-primary caregivers. We agree with the trial court that the grandparents fulfilled their burden of demonstrating that the mother was "`guilty of such misconduct or neglect to a degree which renders [her] an unfit and improper person to be entrusted with the care and upbringing of the child in question.'" Terry, 494 So.2d at 632 (quoting Ex parte Mathews, 428 So.2d 58, 59 (Ala.1983)) (emphasis omitted).
Having concluded that the trial court's finding of unfitness was not plainly and palpably wrong, the question arises whether placement with the grandparents is in the child's best interests. In this regard, the mother contends that the grandparents should not have been awarded custody of the child because of the presence of the child's father, i.e., the grandparents' son, in the grandparents' home, as well as the grandparents' alleged past condonation of their son's sexual conduct with the mother when she was a teenager.
However, the evidence before the trial court tends to show that the grandparents are stable and settled community citizens, that the child has thrived in the grandparents' care, and that he prefers living with the grandparents and attending school there. The record also contains testimony that the grandparents' son is frequently out of town, that he lives in a downstairs apartment on the grandparents' property, and that he had not been intoxicated in the presence of the child. Although the child gave testimony that he had seen his father drink alcohol "a few times," and that his father had occasionally come home "sleepy" or "ill," he denied having seen his father drunk, and denied having received physical discipline from the father except on one occasion when the child's principal had paddled him earlier in the day. There *867 was no evidence presented indicating that the father's presence in the home had had any demonstrable negative effect on the child during his time in the grandparents' custody. Moreover, there was evidence before the trial court indicating that the grandparents had been attentive to the child's needs during their period of custody, and the trial court could properly have discounted their alleged condonation of their son's sexual relationships, including his relationship with the mother before their marriage during the 1980s, as immaterial to their fitness as parents.
Based upon the foregoing evidence and authorities, we conclude that the trial court properly awarded custody of the child to the grandparents based upon the mother's unfitness as a parent. That court's judgment is due to be affirmed.
AFFIRMED.
YATES, P.J., and THOMPSON and PITTMAN, JJ., concur.
CRAWLEY, J., dissents.
CRAWLEY, Judge, dissenting.
I respectfully dissent. The grandparents were required to prove, by clear and convincing evidence, that the mother is unfit. See Ex parte Terry, 494 So.2d 628 (Ala.1986). Both grandparents testified that the mother had been a good mother. In fact, the root of the grandparents' problem with the mother is her decision to admit the son to a mental-health-care facility after he, according to the mother and stepfather, stated an intention to take his own life. The mother may have, as the grandparents contend, overreacted; however, her decision was made in good faith based upon a recommendation by a mental-health professional. Accordingly, I do not believe that the grandparents presented clear and convincing evidence indicating that the mother is unfit. Accordingly, I would reverse the trial court's award of custody to the grandparents.
NOTES
[1] The mother moved again during the pendency of the case, and testified that she and her current husband were planning yet another move.
[2] The child testified to having received grades ranging from excellent to failing while in school in Tuscaloosa immediately before coming to live with his grandparents.
[3] Based on the child's testimony, it would appear that the stepfather's use of a neck holdwhat the child called "the neck thing"is common, and that doing so always hurts the child.
[4] The grandparents denied ever having heard the child make similar statements to them during their care of the child.